# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**MARK CHARTIER,**                          )
)
    **Plaintiff,**                          )    **Civil Action No.**
)    **08-40237-FDS**
    **v.**                          )
)
**BRABENDER TECHNOLOGIE, INC.,**            )
)
    **Defendant.**                          )
_____)

## AMENDED MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT AND MOTIONS TO STRIKE

**SAYLOR, J.**

This is a product liability action against a manufacturer of industrial feeders. In March 2005, plaintiff Mark Chartier's right ring finger was severely injured when he reached into a feeder designed and manufactured by defendant Brabender Technologie, Inc. He alleges that his injury was caused by Brabender's negligence and breach of the implied warranty of merchantability. Jurisdiction is based on diversity of citizenship.

The feeder was used to deliver synthetic rubber as part of a manufacturing operation. As delivered, the feeder had a fixed guard on it that prevented workers from gaining access to the machine while it was operating. (It also contained a warning label instructing operators not to insert their hands into the machine). The feeder, however, periodically clogged when the rubber clumped. Chartier's employer hired a contractor to cut a hole in the guard with an acetylene torch, and installed a plexiglas hatch door, so that workers could gain access when necessary to unclog the feeder. Chartier was injured when he stuck his arm, up to the elbow, through the door in order to perform an unclogging operation.

This case presents a somewhat unique situation as to the expert opinion offered by the plaintiff. Plaintiff's expert witness, Wilson Dobson, prepared a very brief expert report in which he opined that the feeder as designed and manufactured by Brabender *was* defective because it provided no means of access. In his deposition, however, Dobson testified that the feeder as designed and manufactured *was not* defective, and that the problem was that "for whatever reason," the feeder and the manufacturing process "did not work together." (Dobson Dep. at 55). Dobson's expert report and his deposition testimony thus offer directly contradictory evidence as to one of the critical issues in the case: whether the product was defective.

Brabender has filed two motions to strike the expert report, on the grounds that (1) the report was not originally authenticated by an affidavit and (2) it contradicted Dobson's deposition testimony. Brabender has also moved for summary judgment. For the reasons set forth below, the motion to strike for failure to authenticate will be denied; the motion to strike as to inconsistencies will be granted in part and denied in part; and the motion for summary judgment will be granted.

## I.    Background

The facts are presented in the light most favorable to the plaintiff, the non-moving party. Except where otherwise noted, the facts are undisputed.

### A.    The Parties

Plaintiff Mark Chartier is a resident of Phillipston, Massachusetts. At the time of his accident, he was employed by Solvay Engineered Polymers, Inc., a company in Shirley, Massachusetts. Solvay is the successor to Thermoplastic Rubber Systems, a company that was located at the site in Shirley before it was acquired in 2004.

Defendant Brabender Technologie, Inc. is a Canadian corporation that manufactures industrial equipment, including feeders.

**B.**     **The Feeder**

Feeders are commonly used in industry and agriculture to deliver products, component parts of products, or other materials into a manufacturing process at a consistent rate.  To perform this function, an operator directs bulk material into a hopper atop the machine.  The material moves from the hopper through the feeder, which discharges the material at a predictable volume, often into a production line.  Virtually any solid material can be regulated by a feeder.

In 2000 and 2001, before its acquisition by Solvay, Thermoplastic purchased several feeders from Brabender.  (Humphry Dep. at 9-10).  Thermoplastic informed Brabender that the feeders would be used to process a synthetic rubber compound called EPDM rubber.  (*Id.* at 10).  Processing EPDM rubber proved challenging, however, because the rubber melted slightly and congealed as it passed through the feeder.  (Smith Dep. at 22).  Congealed rubber clumped on the sides and impeded the flow of material through the feeder.  (*Id.*).  Excessive clumping could cause the feeder to shut down, which in turn would shut down the production line.  (Brunelle Dep. at 47; Chartier Dep. at 118).

Thermoplastic employees devised a solution to the clumping problem.  By inserting a stick into a hole at the top of the feeder, feeder operators could break apart clumped rubber and guide it through the machine.  (Ducharme Dep. at 102; Brunelle Dep. at 51).  Alternatively, operators occasionally used their hands to dislodge clumped rubber.  (Brunelle Dep. at 51).  Representatives of Thermoplastic informed Brabender about the clumping problem soon after

the feeders were purchased.  (*See id.* at 202).  Brabender experimented with the same model of feeder at its headquarters in Canada, and also found that EPDM rubber congealed and clumped. (Brunelle Dep. at 203).

In December 2004, Brabender sold a Feed Module DSR103 feeder to Solvay (which had since acquired Thermoplastic) to replace an older feeder.  (Catton Aff. ¶ 4).  Brabender knew that Solvay would use it to process EPDM rubber.  (Catton Dep. at 31).

Unlike the older feeder models, which required manual loading of rubber through an opening at the top, the new feeder was designed to automatically draw material from an inlet hole into the hopper.  (Smith Dep. at 74; Catton Dep. at 100-01).[1]  A shaft then directed material from the hopper to a horizontal agitator—a rotating device with blades—that regulated flow through the feeder.  A chute leading from the other end of the agitator discharged the processed material.  (Dobson Dep. at 6, 53).

A stainless-steel, fixed-barrier guard was bolted to the top of the feeder.  The guard was designed to prevent individuals from inserting hands or arms into the feeder while it was operating.  (Catton Aff. ¶¶ 5, 6; Dobson Dep. at 27).[2]

Between February 7 and 9, 2005, a contractor hired by Solvay cut and removed a ten-by-fifteen-inch oval in the stainless steel guard with an acetylene torch.  (Dobson Dep. at 27, 59;

---

[1] Brabender feeder models that need to be refilled manually are typically equipped with a cover and a safety grate on top of the hopper.  (Catton Dep. at 98-100).  The grate prevents operators from reaching into the feeder.  (*Id.* at 99).  Feeders that refill automatically are sold with a different cover.  (*Id.* at 100).

[2] Plaintiff's opposition brief asserts both that the feeder had a fixed-barrier guard when it was delivered and that the feeder had no cover when it arrived at Solvay.  The only record support for the latter claim is the testimony of a Solvay employee who admittedly did not see the feeder when it was delivered.  (Smith Dep. at 65).  Several other witnesses, including plaintiff's own expert witness, stated that Solvay hired a contractor to remove the bolted fixed-barrier guard and replace it with a hatched lid.  (Dobson Dep. at 27, 59; Brunelle Dep. at 92-93; Brown Dep. at 66).  The Court concludes that there is no admissible evidence in the record to support the suggestion that the feeder was delivered without a guard.

Brunelle Dep. at 92-93; Brown Dep. at 24, 66). Over the hole, the contractor installed a plexiglass cover, which was attached to the top of the feeder with hinges. The modification thus converted the bolted, fixed-barrier guard to a hatched lid that could open and close. (Dobson Dep. at 27).

Solvay modified the feeder because, as with the previous models, the EPDM rubber regularly clumped in the hopper. (Smith Dep. at 204). The hatched lid enabled feeder operators to peer into the hopper to see whether rubber was clumping. (Brunelle Dep. at 51, 95). Without the lid, operators could not monitor the state of the rubber. (*Id.* at 95). As before, operators inserted a stick or reached in with their hands to dislodge rubber and guide it toward the rotating agitator. (*Id.* at 51). These actions were taken despite a warning label affixed to the feeder that advised against inserting hands into the machine. (Dobson Dep. at 31).

There is no evidence that any Solvay employee informed Brabender that the new feeder—as opposed to the older models—experienced problems with clumping rubber.[3] Brabender ran an independent test on the new feeder with rubber sent from Solvay; the rubber did not clump in that test. (Brunelle Dep. at 209-210 (reporting that the "feeder tests came back good")). However, a representative from Brabender made a service visit to Solvay on February 10 and 11, 2005, after the installation of the hatched lid. (Chance Dep. at 13, 29).[4]

_____

[3] One Solvay employee stated that he was unaware of any discussions between Solvay and Brabender concerning rubber clumping in the new feeder. (Smith Dep. at 204). Several Brabender employees stated that they were never informed by Solvay of a need to inspect rubber inside the new feeder's hopper. (Catton Dep. at 101; Humphry Dep. at 27; Chance Dep. at 28-29). Wilson Dobson, plaintiff's expert witness, testified that he was not aware that anyone at Solvay told anyone at Brabender that an opening was needed at the top of the feeder or that the rubber clumped inside the hopper. (Dobson Dep. at 39).

[4] Paul Brunelle, an employee at Solvay, testified that he was "almost 99 percent sure" that a Brabender technician was present during the installation of the hatched lid. (Brunelle Dep. at 96). He believed this was so because the feeder could not run without a "tie-in for the computer." He could not, however, specifically recall the presence of a Brabender representative. (*Id.* at 96). The contractor's representative testified that the lid installation

## C.    The Injury

The new feeder shut down three times on the morning of March 2, 2005.  (Smith Dep. at 172).  Chartier was on duty that day, and had just relieved another employee at the end of a shift. The feeder had restarted and was operating.  To prevent clumping, Chartier reached into the machine to break up the rubber as it moved toward the agitator.  (Chartier Dep. at 119).  His arm was elbow-deep in the feeder when his right ring finger came into contact with the blade of the agitator, causing serious injury.  (*Id.* at 91).  As a result of the impact, the finger needed to be amputated.  (Def. Br., Ex. 3, at 4).[5]

After the accident, Solvay installed grates in openings on top of all their feeders, which, aside from the new feeder, were manually-loading models.  (Brunelle Dep. at 101).

## D.    Plaintiff's Expert Witness

Wilson G. Dobson, a litigation consultant, is an expert witness retained by plaintiff. Dobson inspected the feeder two years after the accident.  (Dobson Dep. at 5).[6]  He was deposed on November 22, 2010.  Attached to plaintiff's January 2011 opposition to summary judgment was a copy of an expert report written by Dobson.  The report was dated September 15, 2010, and was unsworn.  On February 14, 2011, plaintiff resubmitted the report with a sworn affidavit from Dobson attesting to its truth and accuracy.

Dobson testified at the deposition that he has never before tested a feeder, designed a

---

occurred on February 7 through 9, and the invoice related to the Brabender representative's visit listed the service dates as February 10 and 11.  (Brown Dep. at 24, Chance Dep. at 13).

[5] He now suffers from depression and high blood pressure.  (*Id.*).

[6] Dobson holds a bachelor's degree in mechanical engineering and a master's degree in materials engineering.  Since 1983, he has worked for Binary Engineering Associates, Inc., providing to insurance companies and law firms "[f]ailure analysis and accident investigations and accident reconstruction involving machine design, machine guarding, motor vehicles, and material and manufacturing defects."  (Affidavit in Opp. to Mot. to Strike).

feeder, or worked for a manufacturer of feeders. (Dobson Dep. at 6). He has never designed a manufacturing process for feeding materials through feeders, nor has he consulted on the topic. (*Id.* at 22-23). Outside his career as a litigation consultant, he has never worked with EPDM rubber or any other kind of ground rubber. (*Id.* at 7).

Dobson has never seen the Feed Module DSR103 feeder operate, nor has he ever seen any Brabender feeder operate. (*Id.* at 19). He did, however, inspect the feeder. During his inspection, Dobson did not turn on the feeder, test it, or examine the electronic controls that operate the machine. (*Id.* at 19, 59).[7]

Dobson testified that the warning label affixed to the feeder was reasonable and would alert someone to the risk of inserting a hand into the machine. (*Id.* at 31). He stated that it is "[c]orrect" that "Mr. Chartier caused his own accident by putting his hand[] into the machine through an opening created by his employer." (*Id.* at 46). He also testified that if Brabender encountered no problems when it tested rubber sent from Solvay on the new feeder model, it could not reasonably expect that EPDM rubber would cause the feeder to malfunction and shut down. (*Id.* at 29).

With respect to Brabender's knowledge of any issues concerning the clogging of product in the feeder, Dobson testified as follows:

> Q: Now given that Brabender tested the EPDM rubber, and it did not bridge or clog when they tested the material in the feeder, how would they know or should have known that the EPDM rubber would bridge and clog the machine?

---

[7] He testified that he has never seen a feeder process EPDM rubber. (*Id.* at 19). He is not familiar with any industry standards concerning the design of feeders. (*Id.* at 21). He is also unfamiliar with how Solvay processed EPDM rubber at the time of the accident. (*Id.* at 67). When asked if he knows "whether Solvay was processing the rubber in a generally acceptable manner within the industry," he answered, "no." (*Id.* at 25). Further, he did not know whether Solvay improperly processed the rubber in such a way as to cause clumping in the feeder. (*Id.* at 27).

A:      Someone would have to tell them.

Q:      And if someone didn't tell them, then they wouldn't be aware of it?

A:      That's correct.

Q:      And that would have been Solvay that would have had to told [sic] them; right?

A:      Yes.

* * *

Q:      Who at Brabender was told that EPDM will stick inside the machine?

A:      As far as I know, nobody.

Q:      So before the machine was designed, manufactured, and sold, Brabender wasn't told by anybody at Solvay that they needed to see into the machine; correct?

A:      Correct.

Q:      Brabender was not told by anybody that the EPDM rubber would stick inside the machine; correct?

A:      Correct.

(*Id.* at 38-39).

With respect to the design of the machine, Dobson testified as follows:

Q:      And if the folks at Brabender testified that they were—they did not receive any information from Solvay to indicate that there was a [clumping] problem with the EPDM rubber in this machine, you would agree, would you not, that the machine, as designed, was reasonably designed?

A:      Yes.

Q:      And it was not defective?

A:      I've never said the machine was defective.

Q:      So you don't believe the machine was defective as designed and manufactured?

A:    That's correct.

(*Id.* at 46).  At the end of the deposition, Dobson summarized his opinions as follows:

A:    The first opinion is that the machine, as delivered, from the standpoint of guarding, was safe.  My second opinion would be that the modifications made to the machine by Solvay rendered it unsafe.  I think the third opinion is that, for whatever reason, this machine and this process did not work together.  And you can blame that on the material going in or you can blame it on the design of the feeder, but for whatever reason, the two of them did not work together.  And I think that summarizes the opinions.

Q:    So, number one, the machine, as delivered, was reasonably designed and safe for its intended use?

A:    With respect to the guarding, yes.

Q:    And that's your only concern in the case is the guarding?

A:    Yes.

(*Id.* at 55).

Dobson had prepared a very brief expert report prior to the deposition.[8]  In that report, he opined that the feeder as modified by Solvay was in an unreasonably dangerous and defective condition.  (Opp. Br., Ex. 10, at 2).  Dobson further stated in the report that the fixed-barrier guard cover on the feeder as designed and manufactured by Brabender afforded no means by which operators could inspect the feeder or clean the hopper without removing the cover.  (*Id.* at 3).  He opined that Brabender knew or should have known that EPDM rubber had a tendency to clump in the hopper, and, therefore, that an opening for inspecting and dislodging rubber was necessary.  (*Id.*).  Finally, he concluded that "[t]he failure to provide a means to inspect the process or address the processing issues rendered the initial fixed barrier guard supplied with this

---

[8] The report is only three pages long, plus a single line of text.

machine defective.  The guard as supplied was inappropriate for this process."  (*Id.*).  The basis

for this statement was that "[i]t is generally accepted as good engineering practice in the

engineering profession to provide means for operators to safely inspect processes and address

processing issues when it is necessary to do so."  (*Id.*).[9]

### E. Procedural Background

Chartier initiated this action in Massachusetts Superior Court on January 11, 2008.

Brabender was not served with the summons and complaint until November 18, 2008.  It then

timely removed the case to federal court pursuant to 28 U.S.C. §§ 1332 and 1441.  The

complaint contains counts for breach of the implied warranty of merchantability and for

negligent design, manufacture, promotion, selection, advertising, sale, distribution, service,

maintenance, inspection, testing, repair, and failure to warn.  Discovery concluded in November

2010.

## II. Motions to Strike

Defendant has filed two motions to strike the report made by plaintiff's expert witness,

Wilson Dobson.  The Court will consider each in turn.

### A. Motion to Strike under Fed. R. Civ. P. 56(c)(4)

The first motion to strike contends that the report is inadmissible under Fed. R. Civ. P.

56(c)(4) because it was not submitted with a sworn affidavit or declaration.  *See Carmona v.

Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) ("To be admissible at the summary judgment stage,

documents must be authenticated by and attached to an affidavit that meets the requirements of

---

[9] Dobson also opined that Brabender "was aware the agitator was a hazard."  (Opp. Br., Ex. 10, at 3).

Rule 56(e)." (internal quotations omitted)).[10]

In response to the motion to strike, plaintiff filed an affidavit by Dobson attesting to the truth and accuracy of his report. The affidavit stated that the opinions contained within the report were based on "facts from deposition testimony, exhibits and the investigation which [he] conducted in this case." (Dobson Aff. at 1). The affidavit was signed under the pains and penalties of perjury.

By submitting the sworn affidavit, plaintiff cured any procedural deficiencies with respect to the verification of the report. Obviously, it would have been preferable if plaintiff's counsel had followed the rules; it is exasperating at best when lawyers do not follow simple procedural rules, and this Court is always hesitant to overlook such failures. Nonetheless, the omission was quickly cured. The motion to strike will therefore not be granted based on plaintiff's failure to submit a sworn declaration.

### B.      Motion to Strike Due to Contradictory Testimony

The second motion to strike contends that statements contained in the expert report are inadmissible because they directly contradict Dobson's deposition testimony. "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni &*

---

[10] Portions of the former version of Fed. R. Civ. P. 56(e)(1) were carried forward into the revised rules in Fed. R. Civ. P. 56(c)(4), which went into effect on December 1, 2010. Fed. R. Civ. P. Advisory Committee Note to 2009 Amends., Subdivision (c)(4). Although defendant's brief cites to Rule 56(e), the Court will interpret the motion as a motion to strike under Rule 56(c)(4).

The new version of Rule 56(c)(4) no longer requires a formal affidavit, but now permits "a written unsworn . . . statement subscribed in proper form as true under the pains and penalties of perjury." Fed. R. Civ. P. Advisory Committee Note to 2009 Amends., Subdivision (c)(4). Dobson's report, as initially included in plaintiff's opposition to summary judgment, was not signed under the pains and penalties of perjury.

*Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994); *see also Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 20 (1st Cir. 2000); 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Allen, *Federal Practice & Procedure* § 2726 (3d ed. 1998). This rule safeguards the integrity of summary judgment proceedings by preventing a party from "manufactur[ing] a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony is changed." *Abreu-Guzman v. Ford*, 241 F.3d 69, 74 (1st Cir. 2001); *see also Mahan v. Boston Water & Sewer Comm'n*, 179 F.R.D. 49, 53 (D. Mass. 1998); *Murphy v. Ford Motor Co.*, 170 F.R.D. 82, 85 (D. Mass. 1997).

Defendant identifies two conclusions in Dobson's report that are contradictory. The first is the opinion asserting that the feeder was defective as designed. The second is that Brabender "knew or should have known" that EPDM rubber had a tendency to clump in the hopper and would require intervention, and that therefore it should have known that the feeder would require an opening for inspection and access. (Opp. Br., Ex. 10 ¶ 3). In his deposition, Dobson testified that the feeder was not defectively designed, and that absent any indication from Solvay or in-house testing that EPDM rubber clumped in the hopper, Brabender could not reasonably expect clumping in the particular feeder model. (Dobson Dep. at 29). Defendant contends that because plaintiff has offered no explanation for these inconsistencies in Dobson's testimony, the expert report should be struck.

The contention that Dobson's affidavit should be struck because it was submitted after his deposition essentially elevates form over substance. It is technically true that the affidavit authenticating Dobson's report was submitted in February 2011, after he was deposed and in response to summary judgment. But there is no dispute that Dobson completed the report in

September 2010, two months before he testified at the deposition.[11]  This is not a case in which factual representations favoring the non-moving party are introduced to the Court through an affidavit drafted and sworn after a deposition.  Dobson's affidavit only authenticates conclusions that he reached before he testified to the contrary at the deposition.  Under the circumstances, there is little basis for concern that plaintiff engaged in the kind of gamesmanship that *Colantuoni* sought to address.  *See Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 332 n.3 (1st Cir. 2005).

That does not, however, end the analysis.  The fact remains that Dobson's deposition testimony and his expert report are fundamentally inconsistent.  Furthermore, defendant has moved for summary judgment based on statements in Dobson's deposition that contradict his expert report—in particular, his statement that the feeder as designed and manufactured by Brabender was not defective.  The question thus arises whether summary judgment can be defeated based on statements in the expert report that are contradicted by the same expert's subsequent deposition testimony.

One possible approach to the issue is suggested by the Seventh Circuit's opinion in *Freeland v. Enodis Corp.*, 540 F.3d 721 (7th Cir. 2008).  There, an expert witness in a bankruptcy proceeding submitted an expert report that was inconsistent with his deposition testimony; the court disregarded the report and relied on the deposition in order to grant summary judgment.  The Seventh Circuit reversed, noting:

> With respect to the district court's treatment of the defendant's expert's report, the court appears to have discredited his report in part because of inconsistencies

---

[11] Plaintiff represents in his opposition to the motion to strike that his counsel sent defendant's counsel a copy of Dobson's report before the deposition.  Attached to the opposition memorandum is an e-mail that purports to support this claim.  The e-mail, however, is not authenticated by an affidavit, and the Court will not consider it.

> with his deposition testimony. But credibility determinations are not a matter for
> summary judgment.

*Id.* at 738 (citation omitted). The court thus treated the issue as one of credibility, in effect ruling

that where a witness gives two different versions of events, those discrepancies may be used to

impeach his testimony, but are not a basis for excluding it.

After careful consideration, this Court respectfully disagrees with that approach, at least

in this context. It is certainly true that ordinary witnesses often give differing or contradictory

versions of events, and that such differences or contradictions are normally grounds for

impeachment, not exclusion. But expert witnesses are different. A party may not be able to

select its percipient witnesses, but it certainly selects its experts. It would undermine the

integrity of the summary judgment process if a party were simply permitted to ignore any

unhelpful testimony of his own expert witness. Moreover, expert witnesses are required to

adhere to specific and detailed disclosure requirements under Fed. R. Civ. P. 26 (a)(2), the

principal purpose of which is to give opposing parties "a reasonable opportunity to prepare for

effective cross examination and perhaps arrange for expert testimony from other witnesses."

Fed. R. Civ. P. 26(a)(2) Advisory Committee's Note (1993). The purpose behind expert

disclosures, and particularly expert depositions, would be defeated if an expert were permitted to

give varying versions of his opinion, leaving the opponent to guess at which version will be

rendered at trial. Finally, such a result is in keeping with the spirit of the principle that parties

ought not be permitted to manufacture disputes of material fact to defeat summary judgment. In

short, expert witnesses should generally be held to their testimonial concessions, particularly

where those concessions contradict their earlier expert reports.

There might be circumstances, of course, under which such contradictions might be

satisfactorily explained.  An expert might, for example, explain that he was confused by an ambiguous question, or that he made an inadvertent slip of the tongue.  No such explanation, however, was even attempted here.  *See Jeffrey v. United States*, 2004 WL 390810 (W.D. Tex. Jan. 8, 2004) at * 4 (holding that relying on expert report, without explaining discrepancy between that report and expert deposition testimony, was insufficient to defeat summary judgment).

The motion to strike the expert report will therefore be granted to the extent that the report contains statements that were directly contradicted by Dobson's later deposition testimony, and as to which no satisfactory explanation has been given.  The remainder of the report, however, will not be struck.  For purposes of summary judgment, therefore, Dobson will be held to the opinion he rendered at his deposition, at least insofar as that testimony was at odds with his expert report.

## III.    Summary Judgment

### A.    Standard of Review

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing

reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

## B. Negligent Design and Implied Warranty of Merchantability Claims

As noted, Wilson Dobson, plaintiff's expert, was deposed by defendant's counsel, and testified that the feeder was not defective as designed. Relying substantially on his deposition answers, defendant contends that plaintiff has not produced evidence of defective design or other defect sufficient to survive summary judgment.[12]

To establish a breach of the implied warranty of merchantability under Mass. Gen. Laws ch. 106, § 2-314, plaintiff bears the burden of proving "a defect in the product or an unreasonably dangerous condition which existed at the time the product left the [manufacturer's] control." *Enrich v. Windmere Corp.*, 416 Mass. 83, 89 (1993) (citing *Colter v. Barber-Greene Co.*, 403 Mass. 50, 62 (1988)). Negligent design claims, as all claims for negligence, require plaintiff to prove that defendant breached a duty and that the breach caused plaintiff actual harm. *Cigna Ins. Co. v. Oy Saunatec, Ltd.*, 241 F.3d 1, 15 (1st Cir. 2001). Manufacturers have a duty to design products with reasonable care to eliminate foreseeable defects or dangers to product consumers. *Simmons v. Monarch Mach. Tool Co.*, 413 Mass. 205, 211 (1992). They are held to the standard of "an ordinary reasonably prudent designer in like circumstances." *Cigna Ins. Co.*, 241 F.3d at 15 (citing *Fahey v. Rockwell Graphic Sys., Inc.*, 20 Mass. App. Ct. 642 (1985), *overruled on other grounds*, *Allen v. Chance Mfg. Co.*, 398 Mass. 32 (1986); *doCanto v. Ametek, Inc.*, 367 Mass. 776 (1975)).

While negligence liability focuses on the conduct of the manufacturer, warranty

---

[12] Defendant has not challenged the admissibility of Dobson's testimony under Fed. R. Evid. 702 and the principles established in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

liability—a form of strict liability—focuses on whether a product is defective. *See Colter*, 403 Mass. at 61-62; *Correia v. Firestone Tire & Rubber Co.*, 388 Mass. 342, 355 (1983). A manufacturer may, therefore, be found in breach of the warranty of merchantability but may not have acted negligently. *Colter*, 403 Mass. at 62. However, the reverse is not true; where there is no basis for warranty liability, a manufacturer may not be found to have been negligent. *Enrich*, 416 Mass. at 88 (citing *Hayes v. Ariens Co.*, 391 Mass. 407, 410 (1984), *overruled on other grounds*, *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1 (1998)); *Colter*, 403 Mass. at 62.

In claims for both negligent design and warranty liability, the plaintiff must come forward with competent expert testimony that a defect in the product, present at the time it was sold, caused his injuries. *Enrich*, 416 Mass. at 87, 89; *Goffredo v. Mercedes-Benz Truck Co.*, 402 Mass. 97, 102-03 (1988). The Supreme Judicial Court instructs that "[t]he presence of such a defect cannot be inferred in the absence of expert testimony . . . [and] [t]he opinion of nonexperts . . . cannot substitute for th[e] absence of expert testimony." *Enrich*, 416 Mass. at 87.

### 1. Dobson's Deposition Testimony

At his deposition, Dobson testified that (1) the feeder was safe when it was delivered to Solvay; (2) the fixed-barrier guard was reasonably designed and safe for its intended use; and (3) Solvay's modification made the feeder unsafe. (Dobson Dep. at 55). He specifically agreed that he "[did not] believe the machine was defective as designed and manufactured" by Brabender. (*Id.* at 46). He also testified that "for whatever reason" the feeder and process for feeding EPDM rubber did not "work together." (*Id.* at 56). He added, "You can blame that on the material going in or you can blame it on the design of the feeder, but for whatever reason, the two of them did not work together." (*Id.*).

That evidence is not sufficient to establish that a defect in the feeder, as designed by Brabender, caused plaintiff's injuries.  Juries are not permitted simply to speculate that a product may have been defective for "whatever reason," which may (or may not) have included a design defect.[13]

The Court will turn next to the Dobson's expert report.

## 2.    **Dobson's Expert Report**

For the reasons stated above, Dobson's expert report will be struck to the extent that it contradicts his deposition testimony.  That report proffers five conclusions or opinions, two of which are problematic.

In paragraph 1, he addresses the modifications made by Solvay, and concludes that Solvay's actions rendered the feeder unsafe.[14]

In paragraph 2, he concludes that "Brabender was aware the agitator was a hazard." (Opp. Br., Ex. 10, at 3).  For present purposes, the Court will assume that fact to be true.

In paragraph 3, he opines that "Brabender knew or should have known that the product being used by plaintiff's employer had a tendency to clump and bridge in the feeder hopper and this bridging need [sic] to be manually broken up, which in turn required a means to inspect the

---

[13]  Dobson's theory that the "process" and the feeder did not "work together" is hardly a sufficient basis on which a reasonable jury could conclude that the feeder was defective.  Certainly Brabender knew that the feeder would be used for processing EPDM rubber.  But did Brabender's design of the feeder cause the clumping?  Or was it the way Solvay handled the rubber, or otherwise conducted its operations?  Was the rubber itself defective?  Dobson does not say.

[14]  Dobson opines in paragraph 1 that the feeder was in a dangerous and defective condition at the time of the accident because the hatched lid installed by Solvay was not a fixed-barrier guard, the feeder did not automatically shut down when the hatched lid was opened, and an operator could reach the agitator blades through the hatch.  (Opp. Br., Ex. 10, at 2).  Dobson also states that, given the distance between the hatch and the agitator, the size of the hatch exceeded safety standards.

hopper for bridging, and manually break it up if necessary." (*Id.*).[15] This paragraph contradicts his deposition testimony and will be struck.

In paragraph 4, he opines that "Brabender supplied the hopper with a solid cover with no means to inspect or clean the hopper without removal of the hopper cover." That fact appears to be undisputed.

The critical opinion is set forth in paragraph 5. There, Dobson states that "[t]he failure to provide a means to inspect the process or address the processing issues rendered the initial fixed barrier guard supplied with this machine defective. The guard as supplied was inappropriate for this process." (*Id.*). The sole basis provided for this conclusion is that "[i]t is generally accepted as good engineering practice in the engineering profession to provide means for operators to safely inspect processes and address processing issues when it is necessary to do so." (*Id.*). This paragraph contradicts his deposition testimony, and will be struck.

The portions of the expert report that have not been struck are not sufficient to establish that the feeder was defective at the time it was sold by Brabender, or to establish a material issue of disputed fact. Taken in conjunction with Dobson's deposition testimony that the product was not defective as designed, summary judgment for the defendant is appropriate. Plaintiff simply has not submitted expert evidence that the product as designed by Brabender was defective. And if the product is not defective as sold, the manufacturer cannot be found liable.

It is worth noting that Dobson's expert report is probably deficient even if no portion of it had been struck. Among other things, it does not address some very basic questions: When is it "necessary" to gain access to the internal workings of the feeder to "address processing issues"?

---

[15] "Bridging" is a term used to describe the clumping of the rubber in the hopper.

What causes those processing issues?  How should those issues be addressed?  What part of the machine needs to be accessed to address those issues safely?  How should that access be obtained?  If access is obtained through a hatch, where should it be located?  How large should it be?  Does the machine need to be accessed while it is operating?  What does the operator need to do after he gains access?  How can that operation be performed safely?  What are the design alternatives?  How much do they cost, and what is the cost-benefit analysis?

These questions presumably could be answered by the right witness—someone who had relevant expertise and could bring it to bear on the problem.  Dobson, however, has no such expertise, and makes no effort to answer those questions.  He acknowledges that he is unfamiliar with industry norms and design standards for feeders and unfamiliar with feeders themselves, and indeed knows next to nothing about the topic.[16]  He has never observed a feeder operate—much less the feeder that is the subject of this case, with the material at issue.[17]  He offers no safe design alternatives.  And his opinion rests entirely on generalized notions of "good engineering practice"—specifically, the tautological statement that it is necessary to provide safe access to machines when it is necessary to do so—not on any specific knowledge of feeders or feeder design.

In any event, the Court need not reach the issue.  For the reasons set forth above,

---

[16] Dobson testified at his deposition that he cannot form an opinion as to whether Solvay's method of processing EPDM rubber through the feeder, rather than the design of the feeder, required that operators monitor and dislodge clumping rubber.  (Dobson Dep. at 27, 67).

[17] At his deposition. Dobson testified that he has never tested or designed a feeder or worked for a manufacturer of feeders.  (Dobson Dep. at 6).  He has never seen a Brabender feeder operate, including the Feed Module DSR103 at issue in the case.  (*Id.* at 19).  During his inspection he did not activate the feeder and observe how it processed EPDM rubber.  (*Id.* at 19, 59).  Most importantly, he testified that he is not familiar with industry standards concerning the design of feeders.  (*Id.* at 21).  He could not comment on whether Solvay processed EPDM rubber in conformance with industry standards or in such a way as to cause rubber to congeal and clump.  (*Id.* at 25, 27).

summary judgment will be granted to Brabender on the claims of defective design.

### 3.     Whether Expert Testimony is Necessary

Plaintiff's final argument is that expert testimony is not required in this case because a jury, through its own knowledge, could assess whether the feeder was designed with a defect that caused Solvay to install a hatched lid and expose plaintiff to an unreasonable risk of injury. *See Smith v. Ariens Co.*, 375 Mass. 620, 625 (1978); *doCanto*, 367 Mass. at 782.  In *Smith v. Ariens*, the Supreme Judicial Court held that a jury could reasonably conclude without expert testimony that sharp, unshielded, metal protrusions on the handlebar of a snowmobile constituted a design defect sufficient to sustain negligence liability. *See* 375 Mass. at 625.  Likewise, in *doCanto v. Amekek, Inc.*, expert testimony was not necessary to establish that a design defect in an industrial ironing machine caused the plaintiff's hand to be sucked into the machine before it automatically shut down. *See* 367 Mass. at 782.

These cases are plainly distinguishable.  The unreasonable dangers posed by sharp metal protrusions on a handlebar and a machine that draws in body parts before shutting down are obvious and can be assessed by jurors based on life experience.  By contrast, it is not obvious to a layperson that an industrial feeder with a bolted, stainless-steel, fixed barrier guard—designed to prevent operators from inserting hands and other body parts—contains a design defect that poses an unreasonable risk of harm.  Expert testimony is needed to assess the fixed-barrier guard in light of design norms in the feeder industry, to explain whether automatically-refilling feeders typically require a hole for ingress and inspection, and to explain whether Solvay processed EPDM rubber in conformance with standard procedures.  None of this information is within the knowledge of a layperson.  It cannot be established without expert testimony. *See Goffredo*, 402

Mass. at 104 (holding that expert testimony was required to establish that a defect in the latch mechanism on a truck caused the door to open, which led to plaintiff's injuries).

Because plaintiff's claims for negligent design and breach of the implied warranty of merchantability are not supported by expert testimony that the feeder was defectively designed, defendant's motion for summary judgment will be granted as to those claims.

**C.** **Remaining Claims**

Defendant has also moved for summary judgment on the remaining counts for negligent manufacture, promotion, selection, advertising, sale, distribution, service, maintenance, inspection, testing, repair, and failure to warn. Plaintiff does not contest that defendant is entitled to summary judgment for the negligent manufacture, advertising, distribution, service, maintenance, inspection, testing, repair, and failure to warn counts. Summary judgment will therefore be granted as to those claims.

What remains are the claims for negligent promotion, selection, and sale. Defendant contends that plaintiff has adduced no evidence to support these claims. Plaintiff responds that there is evidence of defendant's awareness that the feeder was inappropriate for Solvay's processing needs. Assuming that such evidence is in the summary judgment record, the claims for negligent promotion, selection, and sale nevertheless fail for lack of evidence. Plaintiff has introduced no evidence concerning defendant's promotion, selection, or sale of the particular feeder at issue in this case. The facts that defendant knew the feeder would be used to process EPDM rubber and that a Brabender representative made a service visit to Solvay in February 2005 do not create triable claims that defendant breached a duty of care related to promotion, sale, or selection of the feeder, and that the breach caused harm for which plaintiff can recover.

As the remaining negligence counts are wholly lacking in evidentiary support, defendant is entitled to summary judgment on the claims.

**IV.**     **<u>Conclusion</u>**

For the foregoing reasons, defendant's motion to strike the expert report on grounds of contradictory deposition testimony is GRANTED in part and DENIED in part; its motion to strike the affidavit for lack of authentication is DENIED; and its motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor

F. Dennis Saylor IV

United States District Judge

Dated: October 5, 2011